**Timothy S. DeJong,** OSB No. 940662
Email: tdejong@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Suite 500
Portland, Oregon 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840

**Brian D. Long**  (*Pro Hac Vice* Application to be filed)
Email: bdl@rl-legal.com
**Gina M. Serra**  (*Pro Hac Vice* Application to be filed)
Email: gms@rl-legal.com
RIGRODSKY & LONG, P.A.
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Telephone:  (302) 295-5310

**Attorneys for Plaintiff Paul Parshall**

[Additional Counsel of Record Listed on Signature Page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:17-cv-00035 |
| Plaintiff, | CLASS ACTION |
| v. | |
| LATTICE SEMICONDUCTOR CORPORATION; DARIN G. BILLERBECK; JOHN BOURGOIN; ROBIN ABRAMS; BRIAN BEATTIE; ROBERT HERB; MARK JENSEN; JEFF RICHARDSON; FRED WEBER; CANYON BRIDGE CAPITAL PARTNERS, INC.; CANYON BRIDGE ACQUISITION COMPANY, INC.; and CANYON BRIDGE MERGER SUB, INC., | **COMPLAINT** (Violation of The Securities Exchange Act Of 1934)<br><br><br>JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on November 3, 2016 (the "Proposed Transaction"), pursuant to which Lattice Semiconductor Corporation ("Lattice" or the "Company") will be acquired by Canyon Bridge Capital Partners, Inc. and its affiliates.

2.      On November 3, 2016, Lattice's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Canyon Bridge Acquisition Company, Inc. ("Parent") and Canyon Bridge Merger Sub, Inc. ("Merger Sub," and together with Parent and Canyon Bridge Capital Partners, Inc., "Canyon Bridge").  Pursuant to the terms of the Merger Agreement, shareholders of Lattice will receive $8.30 per share in cash.

3.      On December 28, 2016, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the

Page 1 - CLASS ACTION COMPLAINT

1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Lattice common stock.

9.     Defendant Lattice is a Delaware corporation and maintains its principal executive office at 111 SW Fifth Avenue, Suite 700, Portland, Oregon 97204.  Lattice's common stock is traded on the Nasdaq GS under the ticker symbol "LSCC."

10.     Defendant Darin G. Billerbeck ("Billerbeck") is a director of Lattice and has served as President and Chief Executive Officer ("CEO") since November 2010.

11.     Defendant John Bourgoin ("Bourgoin") has served as a director of Lattice since September 2011 and is Chairman of the Board.  According to the Company's website, Bourgoin is a member of the Compensation Committee.

12.     Defendant Robin Abrams ("Abrams") has served as a director of Lattice since September 2011.  According to the Company's website, Abrams is Chair of the Nominating and Governance Committee and a member of the Audit Committee.

13.     Defendant Brian Beattie ("Beattie") is a director of Lattice.  According to the Company's website, Beattie is a member of the Audit Committee.

Page 2 - CLASS ACTION COMPLAINT

14.    Defendant Robert Herb ("Herb") has served as a director of Lattice since August 2013.  According to the Company's website, Herb is Chair of the Compensation Committee and a member of the Nominating and Governance Committee.

15.    Defendant Mark Jensen ("Jensen") has served as a director of Lattice since June 2013.  According to the Company's website, Jensen is Chair of the Audit Committee.

16.    Defendant Jeff Richardson ("Richardson) has served as a director of Lattice since December 2014.  According to the Company's website, Richardson is a member of the Audit Committee and the Nominating and Governance Committee.

17.    Defendant Fred Weber ("Weber") has served as a director of Lattice since May 2015.  According to the Company's website, Weber is a member of the Compensation Committee.

18.    The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

19.    Defendant Canyon Bridge Capital Partners, Inc. is a global private equity buyout fund headquartered in Palo Alto, CA.

20.    Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

21.    Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Lattice (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23.    This action is properly maintainable as a class action.

Page 3 - CLASS ACTION COMPLAINT

24.     The Class is so numerous that joinder of all members is impracticable.  As of October 28, 2016, there were approximately 121,073,026 shares of Lattice common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

Page 4 - CLASS ACTION COMPLAINT

## SUBSTANTIVE ALLEGATIONS

*Background of the Company*

29.    Lattice provides smart connectivity solutions, powered by its low power FPGA, video ASSP, 60 GHz millimeter wave, and IP products, to the consumer, communications, industrial, computing, and automotive markets worldwide.

30.    On August 9, 2016, Lattice issued a press release wherein it reported its financial results for the fiscal second quarter ended July 2, 2016.

31.    In the press release, Lattice reported that revenue for the second quarter was $99.2 million, which increased 2.8% sequentially as compared to the first quarter 2016 revenue of $96.5 million.

32.    The Company also reported several recent business highlights, including that it launched the industry's first programmable ASSP interface bridge for mobile image sensors and displays, CrossLink™.  CrossLink is a low cost video interface bridge with the highest bandwidth, lowest power, and smallest footprint, making it the optimal solution for virtual reality headsets, drones, smartphones, tablets, cameras, wearable devices, and human machine interfaces.

33.    Lattice also announced that it introduced a suite of nineteen HDMI® transmitters, receivers, port processors, and video processors, enabling high bandwidth FullHD and Ultra HD video transmission in intelligent automation systems.  The latest solutions help customers accelerate time-to-market in the Human Machine Interface, Surveillance, and Display Signage Segments.

34.    With respect to these results, Individual Defendant Billerbeck, President and CEO of Lattice, stated:

Page 5 **-** CLASS ACTION COMPLAINT

We are excited that we exited the second quarter of 2016 with FPGA shipments of greater than 1 million units a day. Revenue for the second quarter came in as expected with gross margin slightly above the high-end of expectations. Non-GAAP operating expenses in the second quarter decreased sequentially but were approximately $2.0 million above the high-end of guidance, as short term variable spending was higher than anticipated. In the third quarter of 2016, we expect double-digit revenue growth along with double-digit reductions in spending. We remain encouraged by the increased traction in our FPGA business, continued success in the broader consumer market with both FPGAs and Imaging products, as well as growth in our industrial and licensing businesses.

35.    On November 7, 2016, the Company issued a press release wherein it reported its financial results for the fiscal third quarter ended October 1, 2016.

36.    In the press release, Lattice reported that revenue for the third quarter was $113.2 million, which increased 14.1% sequentially as compared to the second quarter 2016 revenue of $99.2 million, and increased 3.2% as compared to the third quarter 2015 revenue of $109.7 million on a GAAP basis.

37.    Lattice also reported several recent business highlights.  For example, the Company reported that Epson extended its relationship with Lattice to 60 GHz wireless technology.  Epson's flagship PowerLite Home Cinema 5040UBe3LCD Projector is an industry first with 4K support for the consumer and enterprise markets.  Lattice's SiBEAM 60 GHz wireless technology delivers a robust, cable-like experience that is free from Wi-Fi interference to enable a seamless, high quality video connectivity solution, with an interface compatible with the HDMI® standard for in-room applications.  This is the third generation of Epson's projectors to incorporate Lattice's technology, underscoring the companies' long-term partnership.

38.    Lattice also reported that it expanded its automotive product portfolio with ECP5™ and CrossLink™ programmable devices tailored specifically for interface bridging applications.  Reinforcing Lattice's commitment to the automotive market, the two products deliver optimized connectivity solutions for Advanced Driver Assistance Systems ("ADAS") and

Page 6 - CLASS ACTION COMPLAINT

infotainment applications, while also bridging the gap between emerging image sensor and video display interfaces with legacy automotive interfaces.  Lattice's low power, small form factor are ideal for multi-sensor aggregation and bridging in ADAS applications and enable the use of mobile interfaces in auto subsystems to reduce overall system cost, power, and size.

39.     With respect to these results, Individual Defendant Billerbeck commented:

> Our growth remains on track as we execute on our second half ramp, our R&D roadmap and the strategic initiatives that will help ensure our longer-term success. We achieved a 23% gain in FPGA revenue and continued growth in the overall consumer market. Better than expected manufacturing efficiencies combined with a favorable product mix in the quarter enabled us to deliver a 59.5% gross margin, which was well above our guidance.

### Background of the Proposed Transaction

40.     As set forth in the Proxy Statement, the Proposed Transaction is the result of a flawed process.

41.     In December 2015, "Party A" and "Party B" submitted an indication of interest to acquire Lattice for $8.00 to $8.50 per share, which they raised to $9.00 per share the following month.

42.     In early February 2016, "Party H" submitted an indication of interest to acquire Lattice for $9.00 per share in cash.  Nevertheless, following discussions, Lattice discontinued negotiations with Party H in May 2016.

43.     On May 5, 2016, Abid Ahmad ("Ahmad"), a Lattice senior advisor, met with Benjamin Chow ("Chow"), a representative of "Party J,"[1] regarding a potential strategic transaction.  Chow stated that "*he would be seeking assurances that senior management planned to remain employed with Lattice post-transaction*."  (Emphasis added).  Several weeks later, on May 18, 2016, Individual Defendant Billerbeck met with Chow in Shanghai, China regarding a

---

[1] Chow ultimately formed defendant Canyon Bridge.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

potential transaction.

44.     On July 28, 2016, Party J submitted an indication of interest to acquire Lattice for $8.75 to $9.00 per share in cash.

45.     Shortly thereafter, on August 8, 2016, Lattice and Party J entered into an exclusivity agreement.

46.     On August 17, 2016, Lattice received an expression of interest from "Party E," but the Company was precluded from engaging in discussions with Party E under the terms of the exclusivity agreement with Party J.

47.     On August 21, 2016, Party J lowered its proposal to only $8.30 per share in cash.

48.     On September 6, 2016, Ahmad met with Chow, who had now formed Canyon Bridge, which was interested in acquiring Lattice.

49.     On September 10, 2016, Canyon Bridge submitted a proposal to acquire Lattice for $8.30 per share in cash – the same as its predecessor Party J's August 21 bid, and the ultimate merger consideration.

50.     On September 12, 2016, "Party L" submitted a proposal to acquire Lattice.  The Proxy Statement fails to disclose the terms of the proposal, including the financial value. Nevertheless, the Board determined *not* to engage in negotiations with Party L, and continued forward with discussions with its favored bidder, which apparently was the only bidder to offer post-transaction employment positions for Lattice's management.

51.     The next day, Lattice and Canyon Bridge entered into an exclusivity agreement.

52.     On September 13, 2016, Canyon Bridge's advisor sent a draft merger agreement to Lattice, which again reiterated that "it intended to retain Lattice senior management post-transaction."  Individual Defendant Billerbeck and Chow "discussed the fact that Canyon Bridge

Page 8 - CLASS ACTION COMPLAINT

intended to retain Lattice's management post-closing" on October 21, as well as "plans to implement a retention plan for employees post-transaction."

53.    Between September 13 and November 2, 2016, Lattice's and Canyon Bridge's management teams and their advisors negotiated the terms of the Merger Agreement.

54.    On September 21 and 22, 2016, Party E reiterated its interest in a potential transaction with Lattice.  Lattice did not respond to Party E's expressions pursuant to the terms of the exclusivity agreement with Canyon Bridge, and Lattice and Canyon Bridge extended the exclusivity agreement on October 18, October 26, and October 28, 2016.

55.    On October 31, 2016, "Party Q" contacted Individual Defendant Billerbeck regarding its interest in a potential strategic transaction with Lattice.  Again, Lattice was precluded from engaging in discussions with this interested party under the exclusivity agreement with Canyon Bridge.

56.    On November 2, 2016, the Board approved the Proposed Transaction, and the parties executed the Merger Agreement the following day.

***The Preclusive Merger Agreement***

57.    The Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

58.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 5.02(a) of the Merger Agreement states:

Page 9 - CLASS ACTION COMPLAINT

(a) Except as otherwise expressly permitted by this Section 5.02, from the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with its terms, the Company will not, nor will it authorize or permit any of its Affiliates or any of its or their respective directors, officers or employees or any of their respective investment bankers, accountants, attorneys or other advisors, agents or representatives (collectively, "Representatives") to, directly or indirectly: (i) solicit or initiate, or knowingly encourage, induce or facilitate, any Takeover Proposal or any inquiry, proposal or request for information that may reasonably be expected to lead to a Takeover Proposal; (ii) other than solely to the extent necessary to inform a Person of the existence of the provisions contained in this Section 5.02, participate in any discussions or negotiations with any Person (other than with Parent, Merger Sub or any designees of Parent or Merger Sub) with respect to, or furnish to any Person (other than to Parent, Merger Sub or any designees of Parent or Merger Sub) any information with respect to, or cooperate in any way with any Person (other than with Parent, Merger Sub or any designees of Parent or Merger Sub) with respect to, any Takeover Proposal or any inquiry, proposal or request for information that may reasonably be expected to lead to a Takeover Proposal; (iii) agree to, approve, endorse, recommend or consummate any Takeover Proposal or enter into any letter of intent, memorandum of understanding, agreement in principle or similar document, or any Contract (other than an Acceptable Confidentiality Agreement entered into compliance with this Section 5.02) or commitment contemplating any Takeover Proposal; (iv) take any action to make the provisions of any state takeover statute or similar applicable Law (including the restrictions under Section 203 of the DGCL), or any anti-takeover provision in the Company Charter, inapplicable to any transactions contemplated by any Takeover Proposal; (v) grant any waiver, amendment or release under any standstill or similar agreement (and the Company shall promptly take all action necessary to terminate or cause to be terminated any such waiver previously granted with respect to any provision of any such standstill or similar agreement to the extent permitted thereby to do so); or (vi) enter into any Contract that would restrict the ability of the Company to comply with its obligations under this Section 5.02; or (vii) resolve or agree to do any of the foregoing. The Company will, and will cause its Affiliates and its and their respective Representatives to, immediately (i) cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Takeover Proposal or any inquiry, proposal or request for information that may reasonably be expected to lead to a Takeover Proposal, (ii) request the prompt return or destruction of all confidential information previously furnished to any such Person or its Representatives, (iii) terminate all physical and electronic data room access previously granted to any such Person or its Representatives, and (iv) enforce the provisions of any existing confidentiality or non-disclosure Contract entered into with respect to any potential Takeover Proposal.

59.     Further, the Company must advise Canyon Bridge, within forty-eight hours, of any proposals or inquiries received from other parties.  Section 5.02(c) of the Merger Agreement states:

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

(c) From and after the date of this Agreement and prior to the Effective Time, the Company will promptly (and in any event within 48 hours) notify Parent, in writing, in the event the Company or any Company Subsidiary or any of their respective Representatives receives (i) a Takeover Proposal or an inquiry, proposal or request for information that is reasonably expected to lead to, or result in, a Takeover Proposal, (ii) a request to engage in discussions or negotiations with respect to a Takeover Proposal, or (iii) a request for non-public information to the Company or any Company Subsidiary in contemplation of a Takeover Proposal. The Company shall provide Parent promptly (and in any event within 48 hours) with the identity of any Person making any such Takeover Proposal, inquiry, proposal or request and a copy of such Takeover Proposal, inquiry, proposal or request (or, where such Takeover Proposal, inquiry, proposal or request is not in writing, a written description of the Company's understanding of the material terms and conditions of such Takeover Proposal, inquiry, proposal or request), including any modifications thereto. The Company shall (i) keep Parent reasonably informed on a current basis (and in any event no later than 48 hours after the occurrence of any material changes, developments, discussions or negotiations) of the status of any Takeover Proposal, inquiry, proposal or request (including the material terms and conditions thereof and of any material modification thereto), and any material developments, discussions and negotiations, and (ii) provide Parent promptly (and in any event within 48 hours) after receipt thereof of copies of any written material that constitutes a Takeover Proposal (or amendment thereto) including copies of any proposed Alternative Acquisition Agreement and any financing commitments related thereto. Without limiting the foregoing, the Company shall promptly (and in any event within 48 hours) notify Parent in writing if it determines to begin providing information or to engage in discussions or negotiations concerning a Takeover Proposal in accordance with Section 5.02(b) and shall in no event begin providing such information or engaging in such discussions or negotiations prior to providing such notice.

60.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Canyon Bridge a "matching right" with respect to any "Superior Proposal" made to the Company.  Sections 5.02(f) and (g) of the Merger Agreement provide:

(f) Notwithstanding anything in Section 5.02(a) or Section 5.02(d) to the contrary, but subject to Section 5.02(g), at any time prior to obtaining the Company Stockholder Approval if (i) the Company receives from a third party a Takeover Proposal after the date of this Agreement, (ii) a material breach by the Company of this Section 5.02 has not led to the making of such Takeover Proposal, and (iii) the Company Board determines in good faith, after consultation with its financial advisor and outside counsel, that (A) such Takeover Proposal constitutes a Superior Proposal after giving effect to all of the adjustments to the terms of this Agreement which may be offered by Parent and (B) the failure to approve or

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

recommend such Superior Proposal would be inconsistent with the Company Board's fiduciary duties to the Company's stockholders under applicable Law, then the Company Board may effect an Adverse Recommendation Change or terminate this Agreement pursuant to Section 8.01(c)(ii) to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal.

(g) Notwithstanding anything in this Agreement to the contrary, the Company Board may not effect an Adverse Recommendation Change or terminate this Agreement pursuant to Section 5.02(f) unless:

(i) the Company shall have provided prior written notice to Parent, at least four Business Days in advance (the "Notice Period"), of its intention to take such action with respect to such Superior Proposal, or Intervening Event, as the case may be, which notice shall specify, in reasonable detail, (A) in the case of any action being taken in connection with a Superior Proposal, the material terms and conditions of such Superior Proposal (including the identity of the Person making such Superior Proposal), and shall have contemporaneously provided to Parent a copy of any proposed definitive Contract(s) with respect to such Superior Proposal (the "Alternative Acquisition Agreement"), or (B) in the case of any action being taken in connection with an Intervening Event, the facts underlying the Company Board's determination that an Intervening Event has occurred and the rationale and basis for making an Adverse Recommendation Change as a result of such Intervening Event;

(ii) prior to effecting such Adverse Recommendation Change or terminating this Agreement to enter into an Alternative Acquisition Agreement with respect to a Superior Proposal, the Company shall, and shall cause its Representatives to, during the Notice Period, negotiate with Parent in good faith to make such adjustments to the terms and conditions of this Agreement so that such Takeover Proposal ceases to constitute a Superior Proposal or to obviate the basis for an Adverse Recommendation Change; and

(iii) following any negotiation described in Section 5.02(g)(ii), the Company Board determines, after taking into account any changes to the terms of this Agreement agreed to or proposed in writing by Parent, that (A) in the case of any action being taken in connection with a Takeover Proposal, such Takeover Proposal (taking into account any changes to the terms of this Agreement agreed to or proposed in writing by Parent) continues to constitute a Superior Proposal and that the failure to approve or recommend such Superior Proposal would be inconsistent with the Company Board's fiduciary duties to the Company's stockholders under applicable Law or (B) in the case of any action being taken in connection with an Intervening Event, the failure to make an Adverse Recommendation Change in respect of the Intervening Event would be inconsistent with the Company Board's fiduciary duties to the Company's stockholders under applicable Law.

The Parties agree that for purposes of calculating the Notice Period, (A) the first Business Day will be the first Business Day after the date Parent has received notice from the Company, (B) the fourth Business Day will end at 5:00 pm, Pacific time, on such date, and (C) in the event of any material revisions to the terms of a Takeover Proposal after the start of a Notice Period, the Company shall

Page 12 -    CLASS ACTION COMPLAINT

be required to deliver a new written notice to Parent and to comply with the requirements of this Section 5.02(g) with respect to such new written notice, and the Notice Period shall be deemed to have re-commenced on the date of such new notice except that in the event of any such material revisions the Notice Period shall end at 5:00 pm, Pacific time, on the later of (1) the date the Notice Period was originally scheduled to expire and (2) the second Business Day following the delivery of the notice setting forth such material revisions.

61.    Further locking up control of the Company in favor of Canyon Bridge, the Merger Agreement provides for a "termination fee" of $34.18 million, payable by the Company to Canyon Bridge if the Individual Defendants cause the Company to terminate the Merger Agreement.

62.    By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

***Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

63.    The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

64.    Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

65.    The financial analyses performed by the Company's own financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), confirm the inadequacy of the merger consideration.  For example, Morgan Stanley's *Precedent Transactions Analysis* yielded implied present values per share of Company common stock as high as $10.74; its *Discounted Cash Flow Analysis* yielded implied present values per share of Company common stock as high as $10.31 per share; its *Discounted Equity Valuation Analysis* yielded implied present values per share of Company common stock as high as $9.81 per share; and its *Public Trading Valuation Analysis*

Page 13 -        CLASS ACTION COMPLAINT

yielded implied present values per share of Company common stock as high as $9.36 per share.

66.     Moreover, the $8.30 merger consideration is substantially lower than Chow's July 28, 2016 $9.00 per share offer (as well as Party A/Party B's and Party H's similar offers).

67.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

68.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

69.     For example, Lattice's senior management team will retain their positions following the close of the Proposed Transaction.  Individual Defendant Billerbeck, as well as Max Downing, Glen Hawk, and Byron Milstead, have already entered into letter agreements with Parent regarding their post-transaction employment.

70.     Additionally, Individual Defendant Billerbeck stands to receive $5,880,173 in connection with the Proposed Transaction, and the Company's other named executive officers stand to receive $4,118,322.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

71.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

72.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

73.     First, the Proxy Statement omits material information regarding Lattice's financial projections.

Page 14 - 	CLASS ACTION COMPLAINT

74.     For example, the Proxy Statement fails to disclose, *inter alia*, projected GAAP gross margin; restructuring expenses; acquisition-related charges; amortization of acquired intangible assets; interest expense; income tax expense; expected utilization of net operating loss carryforwards; and the basis for the assumption of "$8.0 million of projected cash taxes per year until 2023 and a 35% effective tax rate for subsequent years."

75.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

76.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Certain Prospective Financial Data"; (ii) "Fairness Opinion of Morgan Stanley & Co. LLC"; (iii) "Background of the Merger"; and (iv) "Recommendation of the Board of Directors and Reasons for the Merger."

77.     Second, the Proxy Statement omits material information regarding the financial analyses performed by Morgan Stanley in support of its so-called fairness opinion.

78.     For example, with respect to Morgan Stanley's *Public Trading Valuation Analysis*, the Proxy Statement fails to disclose the benchmarking analysis used by Morgan Stanley to evaluate, "among other things, similarly sized revenue and/or revenue growth rates, market capitalizations, profitability, scale and/or other similar operating characteristics."

79.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose Morgan Stanley's basis for using the assumptions of $8 million per year in taxes as a cash expense and a 35% tax rate in the terminal year.

Page 15 -     CLASS ACTION COMPLAINT

80.    With respect to Morgan Stanley's *Precedent Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples for the transactions observed by Morgan Stanley in its analysis, as well as the "relevant metrics" for each of the selected transactions, which were utilized by Morgan Stanley in determining the ranges of multiples selected and applied in this analysis.

81.    When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

82.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Fairness Opinion of Morgan Stanley & Co. LLC"; (ii) "Certain Prospective Financial Data"; and (iii) "Recommendation of the Board of Directors and Reasons for the Merger."

83.    Third, the Proxy Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

84.    For example, the Proxy Statement fails to disclose the terms of Party L's September 12, 2016 proposal, including the financial value of the proposal.

85.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; and (ii) "Recommendation of the Board of Directors and Reasons for the Merger."

Page 16 -        CLASS ACTION COMPLAINT

86.    The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Lattice's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Lattice

87.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

88.    The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Lattice is liable as the issuer of these statements.

89.    The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

90.    The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

91.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

Page 17 -    CLASS ACTION COMPLAINT

92.    The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

93.    By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

94.    Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Canyon Bridge

95.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

96.    The Individual Defendants and Canyon Bridge acted as controlling persons of Lattice within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Lattice and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

97.    Each of the Individual Defendants and Canyon Bridge was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

98.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

99.    Canyon Bridge also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

100.    By virtue of the foregoing, the Individual Defendants and Canyon Bridge violated Section 20(a) of the 1934 Act.

101.    As set forth above, the Individual Defendants and Canyon Bridge had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

Page 19 -        CLASS ACTION COMPLAINT

C.      Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

DATED this 9th day of January, 2017.

STOLL STOLL BERNE LOKTING &
SHLACHTER P.C.


By: s/Timothy S. DeJong
      Timothy S. DeJong, OSB No. 940662
      Email:  tdejong@stollberne.com

209 S.W. Oak Street, Suite 500
Portland, OR  97204
Telephone:  (503) 227-1600
Facsimile:  (503) 227-6840

-AND-

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
**Brian D. Long**  (*Pro Hac Vice* Application to be filed)
Email: bdl@rl-legal.com
**Gina M. Serra**  (*Pro Hac Vice* Application to be filed)
Email: gms@rl-legal.com
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Telephone:   (302) 295-5310

Page 20 -        CLASS ACTION COMPLAINT

-AND-

**RM LAW, P.C.**
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
(484) 588-5516

**Attorneys for Plaintiff Paul Parshall**

Page 21 -        CLASS ACTION COMPLAINT